THE PEOPLE OF THE STATE OF NEW YORK ex rel. WIL-
LIAM SIMON et al., Constituting The Terminal Station
Commission of the City of Buffalo, Respondents, *v.*
JOHN H. BRADLEY et al., Constituting The Board of
Aldermen of the City of Buffalo et al., Appellants.

Constitutional law — Buffalo (city of) — validity of statute
(L. 1911, ch. 842) creating a railway terminal station commis-
sion of the city of Buffalo.

1. The general legislative power is absolute and unlimited except
as restrained by the Constitution and every act of the legislature
must be presumed to be in harmony with the fundamental law
until the contrary is clearly made to appear.

2. Where two constructions of an act of the legislature are possi-
ble, one of which renders the act unconstitutional and the other of
which renders the act constitutional, that construction will be
given which holds the act constitutional.

3. The legislature within the constitutional limitations may
resume powers delegated to localities and assume the direct control
of matters pertaining to local government. It may, also, either
directly or through a lawful commission, exercise authority over
railroad crossings in securing public safety without violating the
Federal or State Constitutions.

4. Legislative acts relating to grade crossings are not unconstitu-
tional. The work of eliminating grade crossings is not alone for
the benefit of the railroad companies but for the municipality, and
is to the advantage of the people of the state, and public safety is
thereby enhanced:

5. The legislature, by chapter 842 of the Laws of 1911, created a
railway terminal station commission of the city of Buffalo, defined
its powers, and authorized said city to issue its bonds to pay the
expenses which shall be fixed by the commission and be paid by the
city. The purpose of the act is to concentrate the power to make
and enforce a comprehensive plan to relieve the public from the
danger and delay incident to the streets of the city being obstructed
by railroads running upon and across them at grade, and at the
same time relieve the public from inadequate facilities for handling
passengers and freight, and thus advance the commerce of the city
and the state.

6. The act does not violate the provision of the State Constitution
(Art. 8, § 10) prohibiting any county, city, town or village from giv-

ing money or property, or loaning its money or credit, in aid of any individual or corporation. It does not require or permit the city of Buffalo to give or loan its credit in the purchase of real property to be used as the location for passenger and freight depots and other terminal facilities of the railroads. It does not confer authority upon the commission to acquire lands for private purposes of the railroad corporations. The railroad corporations are required to make the changes in the tracks, switches, terminal stations and terminal facilities, and nowhere in the act is there any express requirement that the city, or the commissioners in its behalf, shall or may acquire, temporarily or otherwise, real property for any purpose except in connection with the work of eliminating grade crossings.

7. Although the expenditures for street purposes, authorized by the act in question, are in large part made necessary by the changes in the terminal facilities of the railroads provided by the plans adopted by the commissioners, such changes in the streets are, nevertheless, city purposes and the expenditures therefor proper public expenditures not prohibited by the Constitution. (Art. 8, § 10.)

8. The act in question is not unconstitutional because the commissioners named therein are not elected or appointed as required by section 2 of article 10 of the Constitution which provides, in substance, that all county, town, city and village officers whose election or appointment is not provided for by the Constitution, shall be elected by the people of the political division, or divisions, in which they are to serve, or be appointed by such authorities thereof as the legislature shall designate for that purpose. The members of the terminal commission are new officers and not only new officers, but their duties are essentially new duties, although they include some duties which had been previously performed by city officers.

*People ex rel. Simon* v. *Bradley,* 155 App. Div. ——, affirmed.

(Argued February 6, 1913; decided March 25, 1913.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 22, 1913, which affirmed an order of Special Term granting a motion for a peremptory writ of mandamus to compel the individuals who as aldermen and councilmen constitute the common council of the city of

Buffalo, and the mayor of said city, in substance, to determine the amounts, times of payment and rates of interest of $5,000 of bonds of said city, the proceeds of which shall be used in paying the lawful expenses of the terminal station commission of the city of Buffalo, incurred pursuant to chapter 842 of the Laws of 1911.

Said act of the legislature, including its title, is as follows:

" AN ACT creating a railway terminal station commission of the city of Buffalo, defining its powers and authorizing said city to issue its bonds.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows :*

"SECTION 1. The mayor of the city, ex officio, the commissioner of public works, ex officio, the chairman of the grade crossing commission of said city, William Simon, Spencer Clinton, James Smith, John N. Scatcherd, William Henry Hotchkiss, Henry Schaefer, Robert R. Hefford, H. Montgomery Gerrans and Willian H. Crosby are appointed commissioners, any seven of whom are authorized and directed to adopt, from time to time, plans for the purpose of relieving the congested condition of the railroad stations and terminals in the city of Buffalo, which plans shall require the railroads, or other transportation corporations operating within the city of Buffalo, to make such changes in the location or use of any existing tracks, switches, terminals, stations or railroad facilities within said city, and which shall require the city to make such changes in the location or grades of the streets, alleys or lands owned by said city, adjacent to or contiguous to such tracks, switches, terminals, stations or facilities, which in the judgment of said commissioners will secure to the public freedom from the obstruction of the streets of said city by railroads and adequate services and facilities for the transportation of passengers, freight and property in said city.

"§ 2. The said commissioners shall be known as the 'Terminal Station Commission of the City of Buffalo.' They shall take the oath of office required by the constitution. They shall elect one of their number chairman, and may employ such assistants, including a secretary, an attorney, an engineer or engineers, and provide for their use such offices as they may deem necessary, the salaries of whom and expenses of which shall be fixed by said commission and be paid by the city. Seven of said commissioners shall constitute a quorum for the transaction of business. No contract, lease or grant on behalf of said city shall be let or made unless signed by at least seven of said commissioners, and no act of said commissioners shall be valid unless approved by at least seven of said commissioners.

"§ 3. Before adopting, altering or modifying any plan the commissioners shall give notice of their proposed action to all railroad companies which are to bear any part of the expense of the work for which such plan is made, and shall give them an opportunity to be heard. The commissioners shall make known the plan or modifications of a plan proposed to be adopted by them by filing such proposed plan or modifications of a plan in the office of the chief engineer of the bureau of engineering in said city, and publishing a notice thereof daily in at least two of the daily newspapers published in the city of Buffalo for at least ten days before the first hearing thereon, and shall hear the railroad company or companies interested, and the city and any party interested by their respective representatives or counsel in opposition thereto, or in respect to any proposed change therein. Any railroad company interested, and the city, and any interested party, may at such hearing call and examine witnesses as to the feasibility and expediency of such proposed plan, and of any alteration or modification thereof which may be suggested, and of any new plan that may be suggested. The commissioners shall hear

the proofs and allegations of the parties, reduce the testimony taken by them to writing, and they, or a majority of them, shall make a report in writing, wherein they shall state the plan adopted by them; the location of the railroad passenger and freight stations (which shall be located at or near their present location), yards and appurtenances and facilities to be used in connection therewith, and of the public and railroad approaches thereto, and of the streets, squares and public places contiguous or adjacent to stations, yards, facilities or approaches to be used for said stations, yards and therewith connected facilities by the respective railroad corporations whose railroads enter or operate within the city of Buffalo; the change in the location or grades of the streets, alleys or lands owned by said city, and the change in the grades of existing structures carrying streets over or under railroads, which may be necessary in the judgment of said commissioners to secure to the public freedom from the obstructions of the streets of said city by railroads and adequate services for the transportation of passengers, freight and property in the use of the railroad tracks, switches, terminal stations or facilities. The report shall be filed in the office of the clerk of Erie county, together with the testimony taken before the commissioners, and such report shall thereupon become the plan for the part of the work provided for or referred to therein. The commissioners after adopting any plan or modifying or altering any plan shall give notice thereof to the railroad or railroad companies interested, and to the city, and shall designate the place where such plan or copy thereof will be kept on file for inspection and examination.

"§ 4. After adopting any plan or modification, or alteration of any plan, the commissioners shall make and serve an order directing that such improvements or changes, as have been determined by them, be made within a reasonable time, which shall be specified in the

order, and such railroad or other transportation corporation and the city of Buffalo are hereby required and directed to make the improvements or changes required of them, or any of them, by such order of the commission served upon them as herein provided. Such order shall be served by delivering a copy thereof to the president, vice president or a director of the railroad or other transportation corporation, if it is a domestic corporation, and if it is a foreign corporation by mailing the same to the president or secretary of the company at its principal office, with the postage prepaid thereon, and by delivering a copy of said order to the mayor of the city of Buffalo.

"§ 5. The commissioners are hereby authorized to contract on behalf of the city of Buffalo with any railroad and other transportation corporation owning or operating a railroad within said city for the purpose of carrying out the provisions of this act. They may agree upon behalf of said city with any company for the change of location or grade of any street, alley or public place, which may be necessary, and may agree with said companies for the exchange or sale of lands owned by said city at a price therefor to be determined as hereinafter provided. They may by agreement with the contracting company alter, modify or change any contract heretofore or hereafter entered into by any of said companies and the grade crossing commission of the city of Buffalo. They shall before entering into any contracts cause the detail plans for the work to be done by the contracting parties to be prepared by the chief engineer of the commission, and the engineer representing the company or companies with whom said contract is made may join with him in preparing such plans, and said detail plans shall enter into and form a part of said contract.

"§ 6. The commissioners may agree with any railroad or other transportation corporation interested, and any of them, what portion of the work necessary to be done shall be done by any such company interested, and what

portion of the work shall be done by the city, and what portion of the cost of the proposed improvement shall be paid by each. The cost of any structure and the maintenance thereof built upon the lands to be used by any railroad company in the erection and maintenance of its railroad passenger or freight stations, yard or approach, shall be at the sole expense of said railroad company interested.

"§ 7. In the event that the plans adopted or contracts entered into by the commission, as herein provided, shall include as a necessary part thereof the change of the grade of any street, alley or public place, the closing or alteration of any street, alley or public place, or the taking of any lands to widen any street, or to open new streets, and if any property be injured thereby for which the owners or persons interested therein are lawfully entitled to compensation, or in the event that it becomes necessary to ascertain the fair market value of any lands owned by the city of Buffalo, to be exchanged or sold by it, the commissioners by their chairman shall make application to a special term of the supreme court for the appointment of three commissioners to ascertain the compensation therefor to be paid to the owners of, or parties interested in, lands proposed to be taken, or which may be injured, or to ascertain the fair market value of any lands to be sold or exchanged by the city. Such application shall be made by petition duly verified by one of the commissioners according to the practice of the court, and shall contain a description of the lands sought to be taken, or which may be injured, or of which the fair market value is to be ascertained, and the names of the owners and the parties interested therein so far as they can be ascertained. The petition shall be served by delivering a copy thereof to each person named therein as an owner of or interested in the lands, or by leaving the same at the residence of such person in the city of Buffalo at least fourteen days before the time when the

same is to be presented to the court, or by serving a copy of said petition upon the mayor of the city of Buffalo in case the fair market value of lands to be sold or exchanged by the city is to be ascertained. In case any of the persons named in the petition do not reside in the city of Buffalo or their residence cannot with due diligence be ascertained, or if they or any of them are non-residents of the state, or are infants, lunatics or absent from the state, the court may by order direct the manner in which the petition shall be served, by publication or otherwise, and it shall be served pursuant to the order. Upon the day named in the petition for the presentation thereof, any person named therein as an owner of the lands, or as interested therein, may file an answer denying any material allegation of the petition or may demur thereto. The court shall thereupon try the issue thus made and decide the same. If no answer or demurrer to the petition is filed, or if the issue upon an answer or demurrer is decided against the person filing the same, the court shall appoint three disinterested freeholders of the city of Buffalo commissioners to ascertain and report the just compensation to be paid to the owners and parties interested in the lands for taking the same, or for the injury thereto, or to ascertain the fair market value of said lands, and shall name the time and place for the first hearing before the commissioners. The commissioners shall meet at such time and place having first taken an oath to faithfully discharge their duties as such commissioners and to ascertain and report the just compensation to be paid to the owners of and parties interested in the lands for taking the same, and for the injury thereto, or the fair market value of the lands, where the fair market value of lands is to be ascertained, to the best of their ability. They shall view the lands sought to be taken or claimed to be injured, or of which the fair market value is to be ascertained. The commissioners shall have the power to issue subpœnas to compel the attendance of

witnesses, to administer oaths to witnesses and to adjourn from time to time. They shall hear the proofs and allegations of the parties and report the evidence taken before them together with their decisions of the amount of compensation to be paid to the owners and parties interested in the lands sought to be taken for such lands, or if the lands were not taken the amount to be paid for injury thereto by carrying out the proposed plan, or the fair market value of such lands which is to be ascertained, and shall designate to whom such compensation shall be paid and in what sums according to their respective interests. Upon such report being filed any party interested may move the court for confirmation thereof and it shall be confirmed. The court shall fix the amount of damages, or the fair market value of such lands as are to be ascertained, and the costs and expenses allowed by law to be allowed the landowner and the petitioner, and shall order the same to be paid by the railroad or other transportation corporation and the city in such proportion as shall have been fixed by the commission or by the agreement provided for in section six of this act, and may order the sum named by the commissioners to be paid to the persons designated by them, or may order the whole or any part of the amount paid into court or deposited in some savings bank in the city of Buffalo for their benefit. Upon such payment or deposit being made by the city, the fee of the lands sought to be taken shall vest in the city, and all claims for damages to the property injured shall be extinguished. All proceedings for the taking of lands and the assessment of damages to property in pursuance of the provisions of this act shall, as far a possible, be conducted before one and the same commission under an appointment.

"§ 8. In case the commissioners and any company shall not agree upon the apportionment of the work or the cost of the proposed improvement between the city and any of the said companies, the commissioners may

apply to the supreme court at a special term thereof for the appointment of three commissioners to make such apportionment. Any of said companies may, by notice in writing, require the commissioners to make such application. The application shall be made upon fourteen days' notice to the city and the railroad company or companies who are unable to agree. The court shall appoint three commissioners to make such apportionment. The commissioners shall take the oath required by the constitution, shall hear the proofs and allegations of the parties, reduce the testimony taken by them to writing, and shall, or a majority of them shall, make a report in writing designating what portion of the work necessary to be done shall be done by the railroad company or companies, whose tracks render the work necessary, who shall not have agreed with the commission as to the division of the work or the cost thereof, and what portion shall be done by the city, and the proportion of the cost of the proposed improvement to be paid by each. Such report and testimony taken by the commissioners shall be filed in the office of the clerk of Erie county. Upon such report being filed any party interested may move the supreme court for confirmation thereof and it shall be confirmed. The commission shall notify the railroad company or companies interested and the city of the apportionment of the work between them, and of the time when the designated portions of the work shall begin and the time when it shall be completed.

"§ 9. The commissioners are authorized and empowered to acquire any lands in the city of Buffalo, to close or alter any street, alley or public place, to change in or remove from any such street, alley or public place any gas or water pipes, sewers, conduits or other objects, or change the grade of any street which they shall decide shall be necessary for the purpose of carrying out the plans and contracts hereby authorized, and the proceedings provided for in section seven of this act shall be appli-

cable for the purpose of acquiring title to any lands necessary to be taken.

" § 10. Any lands so taken or any part thereof, or interest or easement therein, shall be used by any railroad, terminal, bridge or other transportation corporation under the provisions of a plan adopted by said commission as provided herein for any of the structures directed to be erected by the commissioners appointed by this act. The commissioners shall notify such company to pay the city the amount fixed by order of the court confirming the report of the commissioners to ascertain the amount of compensation to be paid therefor and the costs and expenses of the proceedings to take the same, and thereupon such company shall pay the same to the city treasurer. Upon such payment being made the fee of the lands taken, or the interest or easement to be acquired therein, shall vest in such company. In case the same is not paid within thirty days after the service of such notice the amount apportioned against the company in default may be recovered by the commissioners by action and applied to the payment of the award.

" § 11. Estimates of the work to be done by the city shall be prepared by the chief engineer of the commission, and he shall advertise for proposals therefor in such form and in such manner as shall be authorized by said commissioners; the proposal shall be reported to the common council and it shall let the work to the lowest responsible bidder. The chief engineer of the commission shall appoint suitable persons to superintend the portion of the work to be done by the city, and shall fix their compensation. The commissioners may authorize the company or companies to do the whole or any portion of the work and the costs of the same may be apportioned as provided in section eight of this act between said companies and the city respectively. In case the cost of the proposed improvement shall be apportioned as provided in section eight, the commissioners may include as a part of the

cost the expense of preparing plans, alteration, change or modification of plans therefor, and any damages that may be awarded under section seven hereof. The city shall upon demand pay to the said company or companies doing the same the proportion of the cost of the proposed improvement apportioned to the city from time to time as the work progresses upon the certificate of the chief engineer of the commission. The said companies may enforce the payment thereof by mandamus and may suspend all work until such payment is made.

"§ 12. If at the end of six months from the time this act takes effect any railroad or other transportation corporation owning or operating a railroad within the city of Buffalo shall not have entered into a contract with the commission for the purpose of performing a portion of the plans of said commission, or shall not have notified the commissioners to apply to the court for the appointment of the commissioners as provided for by section eight of this act, then the said commissioners may designate the proportion of the cost of the work to be paid by such company to carry out said plans, and may compel the payment thereof in whole or by installments as they may require by writ of mandamus.

"§ 13. Whenever the commissioners shall notify any railroad or other transportation corporation to begin work allotted to such company they shall begin and complete their respective portion of the work at and within the time named by the commissioners, and in case of failure to do so the commissioners may compel performance by action of mandamus. In case any of such companies shall neglect to begin or complete the work apportioned to it by the said commissioners, the said commissioners on behalf of the city may do or finish the work and recover the cost thereof from the company in default. The said commissioners may extend the time to commence and complete the work or any portion thereof at any time in their discretion, or either party may apply

to the supreme court in Erie county upon notice to the others, for, and the court may make, an order extending the time to commence or complete the work or any portion thereof.

"§ 14. The expenses of the commission, the cost of the surveys and plans made by their order and the compensation of the attorney, engineers and stenographer employed by them shall be paid by the city. The commissioners named in section one of this act and their successors shall serve without compensation; the other commissioners provided for in this act shall each receive six dollars per day, while in the actual discharge of their duties. Vacancies in any commission mentioned in this act arising from non-acceptance of the office of commissioner or by death, resignation or otherwise after acceptance, shall be filled by the supreme court on the application of either party upon eight days' notice to the other parties interested.

"§ 15. The city may borrow money from time to time to pay all moneys which it may become liable to pay under the provisions of this act, including its share of the expense of doing the work necessary to carry out the plans of the commissioners, to pay awards made against it for taking lands or easements or interests therein or for injury to lands under this act, and to pay for damages to property, including the cost and expenses of ascertaining the same, for the salary of the secretary of the commissioners, the compensation of engineers and attorney employed by them and the expenses of the commission. The mayor and comptroller of the city shall issue its bonds for this purpose in such amounts and payable at such times and bearing such rate of interest as the common council may from time to time determine.

"§ 16. When the work provided for in this act shall be completed, the office, powers and duties of said commissioners shall cease, and the agreements, contracts, plans and other documents and records of and pertaining to their said office shall be deposited, filed and remain as

of the public records and papers in and of the office of the comptroller of said city.

"§ 17. The provisions of any acts or parts of acts, including the charter of the city of Buffalo, which are inconsistent with this act, and in so far only as they are inconsistent with this act, shall have no application to the manner of creating this commission, or to the rights, powers and obligations conferred or created by or under authority of this act or to any proceedings taken thereunder; provided, however, that nothing contained in this act shall in any respect interfere with, restrict, abrogate or modify chapter four hundred and twenty-nine of the laws of nineteen hundred and seven of the state of New York, or any part thereof, entitled 'An act to establish the public service commissions and prescribing their powers and duties, and to provide for the regulation and control of certain public service corporations and making an appropriation therefor,' or the acts amendatory thereof or supplementary thereto.

"§ 18. This act shall take effect immediately."

*Clark H. Hammond, Corporation Counsel (Harry D. Sanders* and *William S. Rann* of counsel), for appellants. The act must be construed to grant to the commission power to agree on behalf of the city of Buffalo to pay a portion of the cost of lands acquired for station and terminal purposes, and to acquire by condemnation lands for that purpose, and to require the city to issue bonds for the purpose of raising money to pay therefor in the first instance. (*Charles River Bridge* v. *Warren Bridge,* 36 U. S. 420; *Stuart* v. *Palmer,* 74 N. Y. 183; *Coxe* v. *State,* 144 N. Y. 396; *Rathbone* v. *Wirth,* 150 N. Y. 459; *Colon* v. *Lisk,* 153 N. Y. 188; *People* v. *Mosher,* 163 N. Y. 32; *Wait* v. *Wait,* 4 N. Y. 95; *Morey* v. *F. L. & T. Co.,* 14 N. Y. 302; *D. & H. Canal Co.* v. *Penna. Coal Co.,* 50 N. Y. 250; *Smith* v. *Brooklyn Savings Bank,* 101 N. Y. 58; *Tallmadge* v. *Pell,* 7 N. Y. 328.) The law violates

article 8, section 10, of the Constitution in that it authorizes the giving of the money and the lending of the credit of the city in aid of a corporation, and the incurring of indebtedness for other than a city purpose. (*Horton* v. *Andrews,* 191 N. Y. 231; *S. P. Assn.* v. *Mayor, etc.,* 152 N. Y. 257; *People ex rel. D., W. & P. R. R. Co.* v. *Batchellor,* 53 N. Y. 128; *Weismer* v. *Vil. of Douglas,* 64 N. Y. 91.) The act contravenes section 2 of article 10 of the Constitution of the state of New York, which provides that all city officers whose election or appointment is not provided for by the Constitution shall be elected by the electors of such cities or appointed by some authorities thereof. (*Sun Publishing Assn.* v. *Mayor, etc.,* 152 N. Y. 257; *People ex rel. Metropolitan St. Ry. Co.* v. *Tax Comrs.,* 174 N. Y. 417; *Astor* v. *Mayor, etc.,* 62 N. Y. 567; *People ex rel. Kilmer* v. *McDonald,* 69 N. Y. 362; *Matter of Application of Woolsey,* 95 N. Y. 135; *People ex rel. Comrs.* v. *Supervisors of Oneida Co.,* 170 N. Y. 105.) The act is unconstitutional as a whole. (*Sweet* v. *City of Syracuse,* 120 N. Y. 316; *People ex rel. Sinkler* v. *Terry,* 108 N. Y. 1; *People ex rel.* v. *Tax Commissioners,* 174 N. Y. 417.)

*Simon Fleischmann, Louis E. Desbecker* and *Roland Crangle* for Charles H. McCutcheon, a taxpayer, intervening. The Terminal Act violates section 10 of article 8 of the Constitution of the state, which provides that no city shall give any money or property or loan its credit to or in aid of any individual, association or corporation, nor shall any such city be allowed to incur any indebtedness except for city purposes. (*Mount Sinai Hospital* v. *Hyman,* 92 App. Div. 70; *Cahill* v. *Hogan,* 44 Misc. Rep. 360; *Stuart* v. *Palmer,* 74 N. Y. 183; *Montana Co.* v. *St. Louis M. & M. Co.,* 152 U. S. 165; *Coxe* v. *State,* 144 N. Y. 396; *Rathbone* v. *Wirth,* 150 N. Y. 459; *Colon* v. *Lisk,* 153 N. Y. 188; *People* v. *Mosher,* 163 N. Y. 32; *Ringlander* v. *Star Co.,* 98 App. Div. 101; *Matter*

*of Grout,* 105 App. Div. 98; *McMullen* v. *Middletown,*
112 App. Div. 81.) The terminal commissioners are city
officers whose essential functions were performed by city
officers existing at the time of the adoption of the Consti-
tution, and as their appointment was made by the legis-
lature instead of by the electors of the city or the local
authorities thereof, the act providing for their appoint-
ment is unconstitutional. (*People* v. *Tax Comrs.*, 174
N. Y. 421.) The Terminal Commission Act is unconsti-
tutional in its entirety. (*Coates* v. *Campbell*, 37 Minn.
498; *U. S.* v. *Reese*, 92 U. S. 214; *I. C. R. R. Co.* v.
*McKendree*, 203 U. S. 514; *U. S.* v. *Ju Toy*, 198 U. S.
262; *El Paso Ry. Co.* v. *Guttierrez*, 215 U. S. 97; *Trade
Mark Cases*, 100 U. S. 82; *Baldwin* v. *Franks*, 120
U. S. 679; *State* v. *Chicago Ry. Co.*, 195 Mo. 228.)

*Wilber E. Houpt* for respondents. Chapter 842 of the
Laws of 1911 is constitutional in all respects. (*Hanra-
han* v. *T. S. Comm.*, 152 App. Div. 349; *Sun Pub. Assn.*
v. *Mayor, etc.*, 8 App. Div. 230; 152 N. Y. 257; *Matter of
Lexington Ave.*, 29 Hun, 303; 92 N. Y. 629; *People ex
rel. Commissioners* v. *Banks*, 67 N. Y. 574; *Matter of
Woolsey*, 95 N. Y. 135; *Admiral Realty Co.* v. *City of
New York*, 206 N. Y. 110.) The act is a lawful and
proper exercise of the police and sovereign powers of the
legislature in procuring public improvements for the con-
venience, safety and general welfare of the public
throughout the whole state. (*People ex rel. M. R. R.
Co.* v. *Tax Comrs.*, 174 N. Y. 417; *People* v. *Kerr*, 27
N. Y. 188; *People ex rel. N. Y. E. L. Co.* v. *Squires*, 107
N. Y. 593; *People* v. *Budd*, 117 N. Y. 1.) The claim
made that the act in question violates and offends article
10, section 2, of the Constitution of the State of New
York, which provides that " all county officers, whose
election or appointment is not provided for by this Con-
stitution, shall be elected by the electors of the respective
counties or appointed by the boards of supervisors, or

other county authorities, as the Legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the Legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this Constitution, and all officers, whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the Legislature may direct," is not well founded. (*Sun Pub. Assn.* v. *Mayor, etc.,* 8 App. Div. 230; *City of Syracuse* v. *Hubbard,* 64 App. Div. 587; *People* v. *Supervisors of Oneida Co.,* 170 N. Y. 105; *Matter of Morgan* v. *Furey,* 186 N. Y. 202; *Scott* v. *Village of Saratoga,* 131 App. Div. 347; *People ex rel.* v. *McDonald,* 69 N. Y. 362.) The claim made that the act in question violates and offends article 8, section 10, of the New York State Constitution which provides that "no county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation * * * nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes," is not well founded. (*Matter of B. & A. R. R. Co.,* 64 App. Div. 257; *Tocci* v. *Mayor, etc.,* 73 Hun, 46; *Matter of Ryers,* 72 N. Y. 1; *Gubner* v. *McClellan,* 130 App. Div. 716; *Fries* v. *N. Y. & H. R. R. Co.,* 169 N. Y. 270; *Muhlker* v. *N. Y. & H. R. R. Co.,* 173 N. Y. 549; *Taylor* v. *N. Y. & H. R. R. Co.,* 27 App. Div. 190; *Matter of N. Y. C. & H. R. R. R. Co.,* 136 App. Div. 760; *Parsons* v. *Van Wyck,* 56 App. Div. 329; *People* v. *Tweed,* 63 N. Y. 202.)

CHASE, J. This appeal presents but one question that requires special consideration and that is whether the act of the legislature above quoted violates the provisions of the Constitution. In considering that question we may

take judicial notice of the location, size and commercial importance of the city of Buffalo. It is conceded that a large number of important trunk-line railroads terminate in or pass through the city, and each has passenger and freight depots and accompanying terminal tracks, sidings and switches within its boundaries. There are several hundred miles of railroad tracks in its streets at grade. The enormous amount of passenger and freight business within the city arises not alone from its large population, but from its being a central point in railroad transportation and the eastern terminal of navigation on the Great Lakes. The extent of the transportation business centered in the city makes the questions relating to grade crossings and terminal and depot facilities therein of great municipal and public importance. In determining such questions the conflicts that arise among public officers or bodies required to act thereon; groups of owners of real property situated in different sections of the city and the several railroad and navigation corporations having independent and special interests involved, make it important that adequate authority and control should rest in some one body of men to determine and enforce plans by which the use of the city streets by railroads at grade shall be avoided and the handling of passengers and freight in the municipal and public interest shall be promoted.

It is not denied that efforts to agree upon a solution of the problems arising from a concededly troublesome and unusual situation have frequently failed. A grade crossing commission for the city of Buffalo was created by chapter 345 of the Laws of 1888, and has since existed. The object of that act was to do away with grade crossings through the action of the city in co-operation with the railroad companies centering in or passing through the same. The agency adopted to accomplish this object was a commission. (*Matter of Grade Crossing Commission, Buf-*

*falo*, 154 N. Y. 550.) That commission has been unable to accomplish the abolition of some of the most important grade crossings and to reasonably improve transportation facilities in the city for lack of adequate authority over the conflicting interests. The public service commission has also been unable, or at least has failed to secure satisfactory results. The act in question was passed in an effort to solve the problems that have concededly existed and that have so far been difficult or impossible of solution, and by solving them bring about a reasonable security to life and limb in the public streets and better commercial facilities for the city.

I do not assert that an unusual and complicated state of facts will justify a disregard by the legislature of constitutional provisions, but I do assert that an unusual and complicated state of facts will justify necessary and adequate legislation to solve the problems arising therefrom.

Is the act contrary to the provisions of the Constitution? The general legislative power is absolute and unlimited except as restrained by the Constitution. (*Matter of Sherrill* v. *O'Brien*, 188 N. Y. 185; *Village of Saratoga Springs* v. *Saratoga Gas, El. L. & P. Co.*, 191 N. Y. 123; *People ex rel. Central Trust Co.* v. *Prendergast*, 202 N. Y. 188.)

Every act of the legislature must be presumed to be in harmony with the fundamental law until the contrary is clearly made to appear. (*People* v. *Gillson*, 109 N. Y. 389; *People ex rel. Kemmler* v. *Durston*, 119 N. Y. 569; *Bohmer* v. *Haffen*, 161 N. Y. 390; *Matter of Stilwell*, 139 N. Y. 337; *Sweet* v. *City of Syracuse*, 129 N. Y. 316; *People ex rel. Metropolitan Street Railway Co.* v. *Tax Commissioners*, 174 N. Y. 417.)

Where two constructions of an act of the legislature are possible, one of which renders the act unconstitutional, and the other of which renders the act constitutional, that construction will be given which holds the

act constitutional. (*Matter of N. Y. & L. I. Bridge Co.* v. *Smith*, 148 N. Y. 540; *Grenada County Supervisors* v. *Brogden*, 112 U. S. 261, 268; *People* v. *Lochner*, 177 N. Y. 145; *People ex rel. Metropolitan Street Railway Co.* v. *Tax Commissioners, supra.*)

The legislature, within the constitutional limitations, may resume powers delegated to localities and assume the direct control of matters pretaining to local government. (*People* v. *Tweed*, 63 N. Y. 202; *People ex rel. McLean* v. *Flagg*, 46 N. Y. 401; *People ex rel. Morrill* v. *Board of Supervisors, Queens Co.*, 112 N. Y. 585.)

In my opinion the most serious objection to the constitutionality of the act in question is the asserted claim that it violates article VIII, section 10, of the Constitution, which provides "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, * * *; nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes. * * * "

It is claimed that the act permits, even if it does not require, the city of Buffalo to give or at least loan its credit in the purchase of real property to be used as the location for passenger and freight depots and other terminal facilities for the railroads. If such is the true construction of the act it is unconstitutional. I do not in anything I say intend to assert the contrary. I think the act can reasonably be construed as not including such authority.

Before examining the provisions of the act under consideration, I will refer briefly to the legislative provisions relating to grade crossings and the decisions of the courts upholding the same.

The legislature, either directly or through a lawful commission, can exercise authority over railroad crossings in securing public safety without violating the Federal or State Constitutions. (*Matter of Boston &*

*Albany R. R. Co.,* 64 App. Div. 257, and cases cited; affirmed, Court of Appeals, 170 N. Y. 619; *Matter of N. Y. C. & H. R. R. R. Co.,* 136 App. Div. 760; affirmed, so far as now considered, in 200 N. Y. 121.)

The acts relating to grade crossings are not unconstitutional, because the work is not alone for the benefit of the railroad companies, but for the municipality, and is to the advantage of the people of the state, and public safety is thereby enhanced.

The present statute in regard to altering existing crossings at grade and under which changes are being made from time to time without the constitutional authority of the legislature to pass the act being challenged, is the Railroad Law [Cons. Laws, ch. 49], (§§ 91 to 99 inclusive).

Where a grade crossing is to be eliminated the statute provides for a division of the expense thereof between the railroad corporation, the municipality and the state. (§ 94.)

It also provides (§ 94) that in carrying out the provisions of an order abolishing a grade crossing, "the expense of construction shall be paid primarily by the railroad company, and the expense of acquiring additional lands, rights or easements shall be paid primarily by the municipal corporation wherein such highway crossings are located."

It also provides (§ 92) that "The municipal corporation in which the highway crossing is located * * * may with the approval of the railroad company acquire by purchase any lands, rights or easements necessary or required for the purpose of carrying out the provisions of sections * * * ninety-one of this chapter; but if unable to do so shall acquire such lands, rights or easements by condemnation either under the condemnation law or under the provisions of the charter of such municipal corporation."

It is apparent that *lands, rights* and *easements* are necessary and required for the purpose of carrying out

the provisions of the Grade Crossing Act, some of which are *ultimately to be occupied by the railroad company.*

The provisions of the Railroad Law relating to grade crossings do not apply to crossings in the city of Buffalo under the jurisdiction of the grade crossing commissioners of that city. (§ 99.) The Grade Crossing Law of the city of Buffalo, hereinbefore referred to, provides specifically for taking real property necessary for carrying out the provisions of the act. The constitutionality of that act has been generally assumed by the parties interested and by the courts. (*Matter of Grade Crossing Commissioners, Buffalo,* 17 App. Div. 54; affirmed, 154 N. Y. 550, and many other reported cases, including 6 App. Div. 327; 21 App. Div. 633; 154 N. Y. 561; 46 App. Div. 473; 166 N. Y. 69; 66 App. Div. 439; 116 App. Div. 549; 52 App. Div. 27; 165 N. Y. 605; 169 N. Y. 605.)

The Grade Crossing Act of the city of Buffalo was amended by chapter 358 of the Laws of 1911, by which there was excepted from the jurisdiction of the commission therein named that part of the city specifically described, being about five miles in length along the lake front.

If the authority of the terminal commissioners to acquire lands or to lend the credit of the city of Buffalo, for the purpose of acquiring lands, is confined to lands to be acquired for the purpose of eliminating grade crossings, the act does not, in the particular now considered, offend against the Constitution.

It is necessary, therefore, to examine the provisions of the act under consideration to determine whether it confers authority upon the commissioners to acquire lands for the private purposes of the railroad corporations.

By the first section of the act the commissioners are authorized and directed to adopt plans, "*which plans shall require the railroads,* or other transportation corporations operating within the city of Buffalo, *to make such changes* in the location or use of *any existing tracks,*

*switches, terminals, stations or railroad facilities* within said city, and which shall *require the city to make such changes in the 'location or grades of the streets, alleys or lands owned by said city,* adjacent to or contiguous to such tracks, switches, terminals, stations or facilities, which in the judgment of said commissioners *will secure to the public freedom from the obstruction of the streets* of said city by railroads and adequate services and facilities for the transportation of passengers, freight and property in said city."

The purpose of the act is to concentrate the power to make and enforce a comprehensive plan to relieve the public from the danger and delay incident to the streets of the city being obstructed by railroads running upon and across them at grade and at the same time relieve the public from inadequate facilities for handling passengers and freight, and thus advance the commerce of the city and the state. That such is the purpose of the act is shown by the first section read as a whole and in connection with the other sections thereof.

In considering the power of the commissioners it is very important to note what the plans adopted by them shall require of the railroads and what they shall require on the part of the city. The requirements from each are defined and specifically stated. All changes in the tracks, switches, terminals, stations or railroad facilities within the city are required to be made by the railroads. The statement of what is required of each is unmistakable and underlies every subsequent provision of the statute. It does not violate the Constitution.

Section 2 of the act is unimportant for the purposes of the present consideration.

Section 3 of the act provides in regard to notice being given before the plans are adopted. In this section of the act it is provided that the commissioners "shall hear the railroad company or companies interested, and the city and any party interested, by their respective repre-

sentatives or counsel   *   *   *   and any interested party, may at such hearing call and examine witnesses as to the feasibility and expediency of such proposed plan." After therein providing, among other things, that the report adopted by them shall state the location of railroad, passenger and freight stations, it further provides that it shall state "the change in the location or grades of the streets, alleys or lands owned by said city, and the *change in the grades of existing structures carrying streets over or under railroads,* which may be necessary in the judgment of said commissioners to secure to the public freedom from the obstructions of the streets of said city by railroads.   *   *   *"

Section 4 of the act provides that after adopting the plans the commissioners shall make and serve an order directing that the improvements therein determined upon by them be made; and it further provides: "And such railroad or other transportation corporation and the city of Buffalo are hereby required and directed to make the improvements or changes required of them, or any of them."

This section read with section 1 of the act, from which I have quoted, is an unmistakable requirement of each railroad corporation *to make the changes required by the plans in its tracks, switches, terminals, stations or railroad facilities.*

Section 5 of the act authorizes the commissioners to contract on behalf of the city with any railroad company for the purpose of carrying out the provisions of the act, and they are authorized to agree with the contracting company for the change of location or grades of any street, alley or public place which may be necessary, and for the exchange or sale of lands owned by said city. The authority to contract with the railroad company in carrying out the provisions of the act refers to work in which the city and the railroad company are jointly interested. In other words, it refers to grade crossing

work.  In such case the duties of the municipality and of the railroad corporations are so intermingled that it is almost impossible to separate the particular duties of each.  It is for this reason that the general and special grade crossing statutes either provide that the parties jointly interested in eliminating such crossings may contract in regard to the expense thereof, or in place thereof define the primary duty of each in carrying out the plans adopted therefor, and for an accounting between them, and a division of the expense incurred.

Section 6 of the act authorizes an agreement in regard to the proportion of work to be done by each.  Such agreement also relates to grade crossing work.  The last paragraph of section 6 is precautionary.  It should not be construed as granting affirmative authority to the commissioners to acquire real property on which terminals shall be located.  Such suggestion is wholly negatived by the clear provisions of the first and fourth sections of the act.

Section 7 of the act provides for condemnation proceedings.  What authority is given by that section ?  It is shown by quoting from the section.  " In the event that the plans adopted *or contracts entered into by the commission,* as herein provided, shall include as a necessary part thereof the change of the grade of any street, alley or public place, the closing or alteration of any street, alley or public place, or the taking of any lands to widen any street, or to open new streets, and if any property be injured thereby for which the owners or persons interested therein are lawfully entitled to compensation, or in the event that it becomes necessary to ascertain the fair market value of any lands owned by the city of Buffalo, to be exchanged or sold by it, the commissioners by their chairman shall make application to a special term of the supreme court for the appointment of three commissioners.  *   *   * "

There is not one word in the section in regard to

condemning lands to make changes in " *tracks, switches, terminals, stations or railroad facilities.*" Such authority is not given because it is wholly unnecessary, as the railroads are required to make such changes as we have hereinbefore seen. The provisions of this section confirm my conclusion that sections 5 and 6 of the act refer to contracts relating to streets, etc.

Section 7 further provides: " The court shall fix the amount of damages, or the fair market value of such lands as are to be ascertained, and the costs and expenses allowed by law to be allowed the landowner and the petitioner, and shall order the same to be paid by the railroad or other transportation corporation and the city in such proportion as shall have been fixed by the commission or by the agreement provided for in section six of this act. * * *"

The provision of the section last quoted necessarily refers to damages fixed for lands taken for streets, etc.

Section 8 of the act relates to the apportionment of work, or the cost of proposed improvements, in case an agreement is not reached between the city and the railroad company, and refers, as does said section 6, to grade crossing work.

The authority given to the commissioners in section 9 of the act to " acquire any lands in the city of Buffalo " is limited by the specific provisions of the act defining what shall be required of the city and of the railroads respectively. I repeat that the railroads are required to make the changes in the tracks, switches, terminals, stations and railroad facilities. Nowhere in the act is there any express requirement that the city, or the commissioners in its behalf, shall or may acquire, temporarily or otherwise, real property for any purpose except in connection with the work of eliminating grade crossings. Authority to acquire real property for any other purpose should not be inferred, particularly when by so doing and so construing the act it will violate a constitutional

provision.    If the provision in said section 9, making the proceeding provided for in said section 7 applicable for the purpose of acquiring title to any lands necessary to be taken, shows that if lands other than for the purposes mentioned in said section 7 are to be taken by the commissioners, then it is clear that such lands or interest in lands to be taken are such as are necessary for the purpose of making the necessary changes in gas or water pipes, sewers, conduits or other objects mentioned in the section itself.    It does not refer to lands to be taken for depot purposes.    Such lands are to be acquired by the railroads.

Section 10 of the act provides: " Any lands so taken or any part thereof, or interest or easement therein, shall be used by any railroad, terminal, bridge or other transportation corporation under the provisions of a plan adopted by said commission as provided herein for any of the structures directed to be erected by the commissioners appointed by this act.    *    *    * "

The *lands so taken* are the lands taken for street purposes, and the word " structures," as mentioned in the above-quoted provision, has the same meaning as the word " structures " in the phrase, " existing structures carrying streets over or under railroads," found in section 3 of the act."

When by the act the city is required to pay for the expense of taking real property, and in said section 10 it provides, " Upon such payment being made (by the railroad company), the fee of the land taken, or the interest or easement to be acquired therein, shall vest in such company," it refers again to lands taken for grade crossing purposes, and the provision that the fee of the land for structures to carry streets over or under railroads is not in conflict with the Constitution for the reasons already stated.

Sections 11, 12 and 13 relate to grade crossing work and work incidental thereto.    In view of the other pro-

visions of the act it clearly is not contemplated by section 13 that the city shall ever erect a depot and recover the cost from the railroad company.

Sections 14, 15 and 16 are unimportant in determining the question now before us.

Section 17 is important because by it the authority of the public service commission is preserved, and it is at least in part through co-operation with that commission that the railroads can be compelled to act and *" make such changes in the location or use of any existing tracks, switches, terminals, stations or railroad facilities,"* as are required by the plans.

The power of the public service commission to order repairs or changes and to enforce its order is stated in article III of the Public Service Commissions Law [Cons. Laws, ch. 48] (§§ 45 to 59 inclusive).

I am of the opinion that the act does not contemplate the use of city money, directly or indirectly, for private purposes. It is true that the expenditures for street purposes are in large part made necessary by the changes in the terminal facilities of the railroads provided by the plans adopted by the commissioners, but the changes in the streets are, nevertheless, city purposes and the expenditures therefor proper public expenditures.

There is no other objection to the constitutionality of the act which, in my judgment, requires special consideration except the claim that the act violates section 2 of article X of the Constitution, which provides as follows: "All county officers whose election or appointment is not provided for by this Constitution, shall be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county authorities, as the Legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the

Legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this Constitution, and all officers, whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the Legislature may direct."

The answer to this objection to the act is the fact that the members of the terminal commission are *new officers*. The commissioners are not only new officers, but their duties are essentially new duties, although they include some duties which had been previously performed by city officers.

In *Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.* (8 App. Div. 230; affd., 152 N. Y. 257) the act creating the rapid transit commission of the city of New York was under consideration. Commissioners were named in the act and given very extended power. The authority given to them was in part new and in part taken from other city officers. The act was sustained notwithstanding the fact that their authority under the act was general and included in a considerable part authority that had theretofore existed in and had been exercised by local officers.

In *People ex rel. Metropolitan Street Railway Co.* v. *Tax Commissioners* (174 N. Y. 417) the act generally known as the Special Franchise Act was under consideration. By that act the state board of tax commissioners, appointed by the governor, was given authority to make an assessment of special franchises for the purposes of general taxation. Such authority was not only given to the state board of tax commissioners, but included therewith was authority to assess the tangible property connected with such special franchises. The tangible property connected with special franchises is not a mere incidental and trifling matter. It consists of property valued at many millions of dollars which had always theretofore been assessed by local assessors for purposes of general taxation. That act was sustained because the tangible property was so closely

connected with the intangible property that it was impracticable to assess it separately.

In the case now before us the act under consideration gives to the terminal commissioners certain authority that had theretofore been vested in part in city officers. For the purpose of carrying out the provisions of the act the duties of the commissioners that are new are so associated and intermingled with the duties now devolved upon them that have heretofore existed in other officers that it is impracticable to wholly separate them. For this reason the appointment of the terminal commissioners by the act does not violate the section of the Constitution last quoted.

The criticisms of the act could in large part have been avoided if greater care had been exercised in its preparation. This court cannot pass upon the degree of skill displayed by the draftsman of the act, or the wisdom of the act either in its entirety or in some of its parts.

The court has only to say whether the act violates the provisions of our fundamental law. I am of the opinion that it does not.

Changes in the act will undoubtedly be made by the legislature if they are suggested and it is shown that they are desirable.

The order should be affirmed, with costs.

CULLEN, Ch. J. (dissenting). The statute creating a railway terminal commission in the city of Buffalo (Laws 1911, ch. 842) is, in my opinion, clearly in conflict with two different provisions of the Constitution of the state and, therefore, void. The first is found in section 10, article VIII, which forbids any county, city, town or village giving any money or property or loaning its money or credit to or in aid of any individual, association or corporation and from incurring any indebtedness except for city or county purposes. The statute requires the city to incur indebtedness to any amount which the commis-

sion created by the statute may deem necessary to carry out the work authorized by it, and hence, the question is whether that work is or is not a city purpose. The statute declares in express terms the purpose for which it is enacted and for the accomplishment of which the work directed by the statute is to be performed: "* * * are appointed commissioners, any seven of whom are authorized and directed to adopt, from time to time, plans for the purpose of relieving the congested condition of the railroad stations and terminals in the city of Buffalo." That the construction in whole or part of railroads which run out of the city of Buffalo to distant points is not a city purpose is conceded and is indeed indisputable (*People ex rel. Murphy* v. *Kelly,* 76 N. Y. 475 at p. 487), though a railroad within the limits of the city for urban travel would be such a purpose. (*Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.,* 152 N. Y. 257.) Hence, the application of any of the city's money or the incurring of any debt by the city for such purpose is a violation of the Constitution, not only because the purpose is not a city purpose, but also because it would be giving the city's money in aid of the corporations owning the railroads. To escape these objections it is contended that the statute authorizes the application of the money of the city only towards the elimination of grade crossings. While the companies might be required to abolish these crossings at their own expense (*N. Y. & N. E. R. R. Co.* v. *Bristol,* 151 U. S. 556), yet, as the improvement is required for the benefit of the highways and the public travel thereon, it is so far a municipal purpose that the municipality can be required to contribute a share of the cost of the work. (*Lehigh Valley R. R. Co.* v. *Canal Board,* 204 N. Y. 471.) Doubtless, of two reasonable constructions of a statute that which does not conflict with the Constitution is to be preferred (*People ex rel. Sinkler* v. *Terry,* 108 N. Y. 1), yet such construction must be reasonable and one of which the statute is fairly suscep-

tible; not one to be obtained only by the distortion or perversion of its language. (*McCluskey* v. *Cromwell*, 11 N. Y. 593, at p. 601.) No fair construction of the statute justifies the claim that the expenditure of the city's money is limited as contended. Reliance is placed upon the requirement that the plan shall not only require the companies to make the necessary changes in the location of their tracks, switches and terminals, but also the city " to make such changes in the location or grades of the streets, alleys or lands owned by said city, adjacent to or contiguous to such tracks, switches, terminals, stations or facilities, which in the judgment of said commissioners will secure to the public freedom from the obstruction of the streets of said city by railroads and *adequate services and facilities for the transportation of passengers, freight and property in said city.*" (Section 1.) I think it will plainly appear on an examination of the subsequent provisions of the statute that the expenditure of the money of the city is not confined to that necessary for changes in the location, grades or structures in the streets, but if it were, that would not save the statute from condemnation. The requirement that the street work shall secure to the public freedom from the obstruction of the streets by the railroads is a mere incident to the object of the statute, to wit, an improvement of the terminals and terminal facilities. It is prescribed, not that streets may be altered in grade or location for the purpose of removing their obstruction by the railroads, but whatever plan is adopted for the improvement of the terminals shall include changes in the streets so that they shall not be obstructed. It is idle to contend that all that this change in the streets was intended to accomplish was the elimination of grade crossings, for in section 3 of the statute, where the details of the plan are again described, the commissioners are authorized to change existing structures carrying streets over or under railroads, showing that in certain cases grade crossings had been already

abolished.  But the decisive answer to the claim is that the statute requires the changes in the streets to be made to secure to the public, not only freedom from the obstruction of the streets, but *" adequate services and facilities for the transportation of passengers, freight and property in said city."*  Therefore, even the street work is not confined to work necessary for the improvement of the street or the security of public travel thereon, which is a municipal purpose, but extends to securing adequate services and facilities for the transportation of passengers and freight, which is not a municipal purpose.  The commission may change the location of the present terminals or of the approaches thereto, thus requiring a new right of way or, at least, an extension of the present right of way, either longitudinally or transversely, and of the terminal grounds, for the improvement of the railroad facilities is the paramount object of the statute.  Now, while the improvement of streets by removing therefrom existing railroads is a city purpose, for which the city may be compelled to contribute, it cannot be compelled to contribute to the expense of the construction of a new line or new terminal, even to the extent of changing the location or grading its streets for that end.  If such changes are necessary for the purpose of giving new or additional railroad facilities, that expense must be borne by the railroad company.  If the change, either in the location or size of the terminal, requires the closing of a street, that expense, including any damage done to abutters who have property rights therein, must be borne by the company; yet, by section 7 it is provided that the compensation to be paid to the owners and parties interested in the lands sought to be taken, or if lands are not taken, the amount to be paid for injury thereto by carrying out the proposed plan, shall be apportioned as may be agreed upon or provided in the agreement between the commissioners and the companies.  The distinction between existing railroad routes and new railroad routes is found in the rail-

road statute, and while the expense of eliminating existing grade crossings is to be apportioned between the company on the one hand and the state and municipality on the other, in equal shares, a new railroad crossing must be made exclusively at the expense of the company. To take the view of the statute most favorable to the respondent, all that can be said is that the statute has authorized the expenditure of city money towards two inseparably blended purposes, for one of which the Constitution authorizes the city to devote its money or credit, for the other of which it forbids such appropriation. Of course, this joining of an illegal purpose with the legal one makes the whole provision illegal; otherwise any lad after six months' service in a law office could draw a statute setting at naught the constitutional inhibitions. The test of the constitutionality of a statute is not what has been done under it, nor what is to be done under it, but what may be done under it. (*Stuart* v. *Palmer*, 74 N. Y. 183, 188; *Colon* v. *Lisk*, 153 N. Y. 188, 194.)

But a review of the statute as a whole will show that the activities of the commission, either in the acquisition of land or in contracts with the companies for the apportionment of cost, are not confined to the streets of the city. To recite all the details of the statute justifying this statement would extend this opinion beyond all reasonable bounds. The reader must be referred to the statute itself. But it is well to call attention to certain prominent features of the act. It is first to be remembered that there had been for years in the city of Buffalo a commission created to deal with the elimination of grade crossings and that the paramount purpose of the present statute was to provide proper terminal facilities, the alteration of the streets being merely a part of the scheme or plan. Therefore, when we find in the statute "the work" or "the provisions of this act," there is meant the whole work or all the provisions of the act. The terms cannot be limited to street operations. Section

40

6 authorizes the commission to agree with any corporations "what portion of the work necessary to be done" should be done by the corporation and what portion by the city. That "the work necessary to be done" includes the whole work of changing tracks and terminals, as well as streets, is made clear by the provision that the cost of any structure and the maintenance thereof on land to to be used as a terminal "shall be at the sole expense of the corporation," a provision that would be absurdly out of place if the work mentioned included only the street work. Why was the provision made that the cost of the structure should be at the sole expense of the company if it was not contemplated the cost of the land might be apportioned between the company and the city ? *Expressio unius exclusio alterius* is a well-settled rule in the construction of statutes (*Wait* v. *Wait,* 4 N. Y. 95; *Morey* v. *Farmers' Loan & Trust Co.,* 14 N. Y. 302), applicable as well to a prohibition as to a grant of power. (*Talmage* v. *Pell,* 7 N. Y. 328.)   Again, section 7 of the statute provides a complete scheme for condemning the lands and easements necessary to the street changes. Section 9 authorizes the commission "*to acquire any lands in the city of Buffalo,* to close or alter any street, * * * to change in or remove from any such street, * * * any gas or water pipes, * * * necessary for the purpose of carrying out the plans and contracts hereby authorized, and the proceedings provided for in section 7 of this act. * * *" Here the power given to the commission is to condemn any land necessary to carry out the plans authorized by the act. But, as already said, the plan authorized was to relieve the congested condition of the railroad stations and terminals, the removal of the obstructions in the streets being incidental. Moreover, if the power here granted is to be confined to street work the provision is wholly superfluous, for full power in this respect is given by section 7. It is suggested that the act may be construed as authorizing the

acquisition of lands only for the purpose of removing or changing the pipes and sewers. It is a sufficient answer that this is not what the statute says; and the answer is made conclusive by the next section (10) which provides that if any land *so* taken, that is to say, taken under the preceding section, is to be used by a corporation under the plan adopted by the commission, the corporation shall pay the amount awarded by the condemnation commission, and upon payment of such award the title thereto shall vest in the corporation. *Surely it never was intended that the title to land to which sewers, water and gas pipes were to be removed, and, of course, on which thereafter maintained, was to be vested in the railroad company and not in the public, nor indeed was it ever intended that such pipes and mains should, on removal, be laid under the route or terminal of a railroad instead of in a public street.* It is thus plain that the statute contemplated that all the lands requisite for the improvement should be acquired by the commission and thereafter the cost apportioned between the companies and the city, the city to pay in the first instance and then to sue the companies if the latter failed to pay their share.

The statute also violates section 2 of article 10 of the Constitution which prescribes that "All city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the Legislature shall designate for that purpose," commonly called the Home Rule Article. It is said that the offices of the commissioners appointed by the act are new, having been created subsequent to the Constitution of 1894, and, therefore, did not fall within this prohibition. That the offices are new does not answer the objection that the appointment of their incumbents was by the legislature instead of by the local authorities or election by the people as required by the Constitution,

if the functions and duties of the office were at the time of the adoption of the present Constitution exercised by the municipal officers. (*People* v. *Raymond*, 37 N. Y. 428; *People ex rel. Bolton* v. *Albertson*, 55 id. 50; *Matter of Brenner*, 170 id. 185.) In *People ex rel. Metropolitan Street Railway Company* v. *Tax Commissioners* (174 N. Y. 417, 434), Judge Vann, speaking for a unanimous court, said: "Unless the office or officer is mentioned *eo nomine* in the Constitution, the name may be changed, or the office abolished, provided the functions, if retained at all, remain in some officer chosen by the locality. *Local functions, however, cannot be transferred to a state officer.* The legislature has the power to regulate, increase or diminish the duties of the local officer, but it has been steadfastly held that this power is subject to the limitation that no essential or exclusive function belonging to the office can be transferred to an officer appointed by central authority. The office may go, but the function must be exercised locally if exercised at all." On the other hand, it is true that the legislature may confer upon officers named by it the prosecution and control, within limits, of some local improvement. (*Astor* v. *Mayor, etc., of N. Y.*, 62 N. Y. 567; *People ex rel. Kilmer* v. *McDonald*, 69 id. 362; *People ex rel. Comrs.* v. *Suprs. of Oneida Co.*, 170 id. 105, and see cases there cited.)

It is quite apparent that these two principles cannot be pushed to extremes without coming into conflict. The question is, therefore, one of degree and it may not be always easy to draw a dividing line between the domain of one rule and that of the other. The present case, however, lies far to the side of any such line and without the debatable ground. The strongest case upholding the legislative power is *Astor* v. *Mayor, etc., of N. Y.* (*supra*). In that case the Central Park commissioners were authorized to open, grade and pave streets lying north of Central Park to the Harlem river included within the prolongation of the western and eastern boundaries of the

park — a small section of the city of New York even as then constituted. No power was given to close or change the location of any of the streets, all of which had been laid out as far back as 1807. In the *Kilmer Case* (*supra*) the statute appointed commissioners to widen and improve a single avenue in the village of Saratoga Springs. In the case of *Supervisors of Oneida* (*supra*) a commission was created to build the county court house. The present statute confers upon the commissioners powers greatly in excess of those conferred by any earlier statute which has been upheld. At the time of the adoption of the present Constitution the construction, management and control of the streets, sewers and water pipes had been vested in the officers of the city of Buffalo. In fact, such matters must have constituted in that city, as well as in other cities, a very large portion of the functions which the municipal officers were called upon to discharge. By the present act (section 9) the commissioners are authorized to close, alter or change the grade of any street, alley or public place in the city, remove any gas or water pipe, sewer or conduit which they may decide necessary for the purpose of carrying out the provisions of the act. Not a rood of the area of Buffalo is exempt from the powers of the commissioners. The city may lay out, open or grade and pave a street one day, and the next the commission may close the street. The city may adopt a system of sewers or water supply with appropriate location of trunk sewers or water mains, and immediately thereafter the whole plan be set aside and brought to naught by the action of the commissioners. The decision of the commission as to what is necessary to be done is under the act conclusive. The commission, indeed, may change the whole map of the city of Buffalo. There is no limit to the pecuniary obligations it may impose upon the city. Under the Constitution the power of municipal corporations to incur debts is strictly limited. The municipality has no control over the expenditures or con-

tract obligations of the commissioners. By the acts of that body the city may be deprived of the power to borrow money for the prosecution of any improvement, however pressing and necessary. There are said by the respondents to be seventeen trunk railroad lines in the city of Buffalo, and the work of the commission must, or at least may, last over many years. During this period the city is necessarily deprived of control of its streets, for it cannot be conceived that the commission is empowered to change the location and grades of streets to accord with the new location of the railroads, and thereafter the municipal authorities suffered to change them back. To uphold the right of the legislature to confer such enormous powers on its own appointees is destructive of the constitutional provision which was intended to secure to localities the right to manage their own affairs. The Grade Crossing Act (L. 1888, ch. 345) is very different from the act now before us. The earlier statute authorized the expenditure of city moneys for a city purpose — the elimination of the then existing grade crossings — and the exercise of the powers of the commission over streets was also so limited. No power was given it to roam at will through the whole city and to deal not only with existing conditions, but with such conditions as the commission itself might thereafter create.

There have been arguments addressed to us which should have no influence on our decision. It is said that ninety per cent of the progressive business men of the city favor the statute. Less than three years ago we all felt constrained to hold a statute unconstitutional, which not only the whole wage-earning class supported, but a large body of other citizens even believed the dictates of humanity required — the Workmen's Compensation Act. The humblest wage-earner and the proprietor of the largest business enterprise stand equal before the law, however unequal in other respects. We should be as indifferent to the demands of one class as to those of

the other. Nor should any suggestion of exceptional circumstances influence our decision. It is said that the existence of these peculiar circumstances are not denied, but as they do not appear in the record, they are not the subject of affirmation or denial and of their existence I know nothing. Nor are they relevant, for if the statute does not violate the Constitution, no justification for it is required; the legislative approval is sufficient. If it does violate the Constitution, no supposed necessity can uphold it. What is the alleged necessity — that the circumstances require a special body of officers vested with powers greater than those bestowed upon any single branch of the city government? That is not the question here involved. The legislature can undoubtedly provide for the creation of a commission with all the powers given to the present commission, except as to the application of city money and credit, to the elimination of which power those who deny its existence in the present statute can hardly object. The constitutional objection is not to the creation of a commission, but to the selection of the commissioners by the legislature instead of by the local officers or electors. The argument of supposed necessity to possess any force must, therefore, be based on the proposition that the electors or local officers of Buffalo have not the ability and cannot be trusted to appoint competent officials to act for the city. That proposition I am prepared to deny; but whether admitted or denied, the People of the state by their Constitution have taken a different view and secured to the people of Buffalo the right to choose either directly or indirectly their own officers.

HISCOCK, HOGAN and MILLER, JJ., concur with CHASE, J.; GRAY and WILLARD BARTLETT, JJ., concur with CULLEN, Ch. J.

Order affirmed.