(168 App. Div. 301)

McCUTCHEON v. TERMINAL STATION COMMISSION OF CITY OF BUFFALO et al.

. (Supreme Court, Appellate Division, Fourth Department. June 9, 1915.)

1. MUNICIPAL CORPORATIONS ☜990—TAXPAYER'S ACTION—WHEN MAINTAINABLE.

While the acts of the Buffalo terminal station commission created by Laws 1911, c. 842, in adopting a plan for the terminals and terminal facilities of certain railroads, and in entering into a contract with the railroad companies for the carrying out of such plans, which plans and contract involved the closing of streets and the exchanging of property between the railroads and the city, might have been reviewed by a taxpayer by certiorari, this was not his only remedy, and he could question the legality and validity of the contract, and the power of the commission to execute it, by an action under Code Civ. Proc. § 1925, and General Municipal Law (Consol. Laws, c. 24) § 51, authorizing taxpayers' actions to prevent waste of or injury to the funds or property of a city, etc.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2151–2156; Dec. Dig. ☜990.]

2. RAILROADS ☜75—TERMINALS—MODIFICATION OF PLANS—HEARING.

Laws 1911, c. 842, creates the Buffalo terminal station commission, and authorizes it to adopt plans, and provides that, before adopting or modifying any plan, the commission shall give notice to interested railroad companies and publish a notice in the newspapers, and shall hear any party interested, and make a report in writing, wherein it shall state the plans adopted, and that this report shall be filed with the county clerk. Held, that where the commission, after the public hearing, and as a result thereof, made certain modifications in the proposed plans, the failure to give a further public notice did not render the adoption of the modified plans illegal.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. ☜75.]

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. MUNICIPAL CORPORATIONS ⊚⟿680, 681—STREETS—POWERS OF TERMINAL STATION COMMISSION.

The Buffalo terminal station commission, created by Laws 1911, c. 842, in adopting plans for the terminals of certain railways, had authority to provide for the laying of an extra track in a street at grade and for the continuance of one track across a street at grade, where such tracks were necessary to carry out the general purpose of the act, though one of the purposes of the act was the elimination as far as possible of grade crossings, especially where plans for such terminals, approved by the public service commission, contained a provision for the continuance of the last-mentioned track.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. ⊚⟿680, 681.]

4. MUNICIPAL CORPORATIONS ⊚⟿1000—TAXPAYERS' ACTIONS—SCOPE OF INQUIRY.

In a taxpayer's action brought to test the validity of plans adopted by the Buffalo terminal station commission, created by laws 1911, c. 842, for certain railway terminals and a contract to effectuate such plans, plaintiff's objection to the placing in the center of a street of a pier to support overhead tracks could not be considered, as it involved no question of the authority of the commission, but only a question as to the wisdom of the plan adopted by it, which could not be reviewed.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2167–2172, 2198; Dec. Dig. ⊚⟿1000.]

5. MUNICIPAL CORPORATIONS ⊚⟿680, 681—RAILROAD TERMINALS—POWER OF TERMINAL COMMISSION—EXCHANGE OF PROPERTY.

The city of Buffalo maintained a water main with connections for fire tugs in a street running to a river, the spur end of which street was to be closed under the plans adopted by the terminal station commission, created by Laws 1911, c. 842. One of the railroad companies owned land abutting on the river, and the plans provided for placing new mains and intakes on this land. The cost of the construction of the new mains and intakes was to be borne by the railroad company, and both the land and spur end of the street had been appraised as required by the statute, where streets were to be closed or lands exchanged or sold by the city. *Held*, that the commission did not exceed its authority by including such parcel owned by the railroad company in the plan.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. ⊚⟿680, 681.]

6. MUNICIPAL CORPORATIONS ⊚⟿871—DISPOSAL OF PROPERTY IN AID OF INDIVIDUALS OR CORPORATIONS.

A city has no property interest in streets in which it has no fee, and even if it owns the fee it has no such property right as would be protected by Const. art. 8, § 10, providing that no city, etc., shall give any money or property to or in aid of any individual, association, or corporation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1817; Dec. Dig. ⊚⟿871.]

7. MUNICIPAL CORPORATIONS ⊚⟿658—STREETS—NATURE OF CITY'S INTEREST.

Where the fee of a street or highway is in a city, the city holds the street in trust for the people at large.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1430; Dec. Dig. ⊚⟿658.]

8. MUNICIPAL CORPORATIONS ⊚⟿657—STREETS—VACATION OR ABANDONMENT —AUTHORITY OF LEGISLATURE.

The Legislature has full power and authority to release the public right in streets in which the city has no fee, and to provide for the closing thereof whenever public interest requires.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. ⊚⟿657.]

9. RAILROADS ☞75—RIGHT OF WAY—COMPENSATION—CLOSING STREETS.

Laws 1911, c. 842, § 9, authorizes the terminal station commission to acquire any lands in the city of Buffalo, close or alter any street, etc., or change the grade of any street when necessary to carrying out the railroad terminal plans and contracts thereby authorized, and provides that the proceedings provided in section 7 shall be applicable for the purpose of acquiring title to any lands necessary to be taken. Section 7 provides that if the plans or contracts include the closing or alteration of any street, etc., or if it becomes necessary to ascertain the fair market value of any lands owned by the city to be exchanged or sold by it, application shall be made for the appointment of commissioners to ascertain the compensation to be paid, or to ascertain the market value of any lands to be sold or exchanged by the city. Held, that the act does not contemplate that the city shall be paid any compensation for the closing of streets in which it has no fee.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. ☞75.]

10. MUNICIPAL CORPORATIONS ☞657—STREETS—POWERS OF TERMINAL STATION COMMISSION.

For many years land on the bank of a river was used for travel to and from the water front, but never dedicated or accepted as a street, or laid out or worked as a street, though resolutions had been adopted as to its improvement and an attempted change in its location. At an early date docks were built across the strip, and the river thereafter encroached on the strip under the docks, and sheds and elevators were built adjacent to it. The Buffalo terminal station commission, created by Laws 1911, c. 842, in adopting plans for the terminals of certain railroads, provided for the closing of this so-called street. One of such railroad companies then owned all of the abutting property, the fee of the street, and the wharves and docks constructed over and beyond it. It was then principally used for travel to and from the docks and wharves. It had been determined that the city was not entitled to collect wharfage, and the plans adopted offered opportunity to extend the docks and provide for direct connection with the railroad terminals. Held, that the commission did not abuse its discretion, or unduly deprive the public of any rights along the river front by providing for the closing of such so-called street.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. ☞657.]

11. MUNICIPAL CORPORATIONS ☞658—STREETS—PRESCRIPTIVE RIGHTS—EXTENT.

If the city had any right in such strip of land as a street or for public travel, it was acquired by prescription, and the extent of the prescriptive easement was governed entirely by the extent of the user.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1430; Dec. Dig. ☞658.]

12. RAILROADS ☞75—RAILROAD TERMINALS—POWERS OF TERMINAL COMMISSION.

Under Laws 1911, c. 842, authorizing the Buffalo terminal station commission to adopt plans for terminals, which plans shall require the railroads "or other transportation corporations" within the city to make such changes in existing tracks, stations, or railroad facilities as will secure adequate transportation facilities, it was the duty of the commission to consider the convenience of lake traffic in connection with terminal plans, and the fact that it provided for the utilization in the erection of a new railroad terminal of lands owned by the railroads adjacent to the river and lake did not suggest that the commission was endeavoring to obtain properties for the railroads to aid them in their competitive lake traffic.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. ☞75.]

─────────────

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13. RAILROADS ☞75—RAILROAD TERMINALS—POWERS OF TERMINAL COMMISSION.

Laws 1911, c. 842, § 6, provides that the Buffalo terminal station commission may agree with any railroad as to the work to be done under its terminal plans by any such company, and the portion to be done by the city, and the portion of the cost to be paid by each. Section 8 provides a method for fixing the amount to be borne by each if the commission and the railroads cannot agree by an application to the Supreme Court for the appointment of commissioners. Section 11 provides that the commissioners may authorize the railroad companies to do the whole or any portion of the work, and the cost to be apportioned as provided in section 8. The commission contracted with railroad companies to carry out plans adopted by it, under which the railroads and the city were to exchange certain lands, and streets in which the city owned the fee were to be closed, and it was provided that if, upon an appraisement of the property exchanged, a balance should be found in favor of the railroads, they should discharge the city from any obligation to pay the excess, and that, if the excess was in favor of the city, it should be considered the city's contribution toward the expense of eliminating grade crossings and relocating streets. There was such an excess in favor of the city, but it amounted to only 17 per cent. of the expense of eliminating such crossings and relocating such streets. *Held*, that the commission did not exceed its authority in contracting that such excess should be contributed toward the improvements in question, and the fact that the money was not paid into the city treasury and afterwards disbursed did not affect the validity of the contract.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. ☞75.]

Appeal from Trial Term, Erie County.

Action by Charles H. McCutcheon against the Terminal Station Commission of the City of Buffalo and others. From a judgment (88 Misc. Rep. 148, 150 N. Y Supp. 850; 88 Misc. Rep. 601, 151 N. Y. Supp. 451) dismissing the complaint, and denying upon the merits the prayer for relief contained in plaintiff's complaint and in the answer of the defendant the City of Buffalo, plaintiff and the City appeal. Affirmed.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

Crangle & Cochrane, of Buffalo (Simon Fleischmann, Roland Crangle, and Edward L. Jung, all of Buffalo, of counsel), for appellant McCutcheon.

William S. Rann, of Buffalo (Ralph K. Robertson, of Buffalo, of counsel), for appellant City of Buffalo.

Wilbur E. Houpt, of Buffalo, for respondent Terminal Station Commission of City of Buffalo.

Rogers, Locke & Babcock, of Buffalo (Charles B. Sears, of Buffalo, of counsel), for respondents Delaware, L. & W. R. Co. and another.

MERRELL, J. On September 6, 1913, the terminal station commission of the city of Buffalo entered into a contract with the Delaware, Lackawanna & Western Railroad Company and the New York, Lackawanna & Western Railroad Company, the purpose of which was to effectuate and carry out certain plans for a railroad terminal in said city theretofore adopted by the commission. This action is

brought in equity by the plaintiff as a taxpayer to declare the contract in question illegal, null, and void, as in violation of various provisions of the Constitution of the state of New York, of the federal Constitution, and of the Terminal Station Commission Act of the Legislature of the state of New York, and as contrary to the public policy.

The defendant Lackawanna Railroad Company has, for many years, maintained tracks in the city of Buffalo crossing Michigan street, with two tracks overhead between Elk and Ohio streets. The tracks in question continue westerly to Ohio street, and through Ohio street partially on an embankment and partly at grade across Illinois street, Love alley, and Indiana, Washington, and Main streets, to the present passenger station, which is situate on the westerly side of Main street. A retaining wall in Ohio street extends for a distance of about 400 feet to Liberty street, and narrows the usable portion of Ohio street between Illinois and Mississippi streets to about 30 feet. The passenger station now in use is small, incommodious, and inadequate for the present traffic, and has so been for some years. There is also a siding on the south side of the main tracks, from the center of Washington street to Liberty street, and switches also run from the main tracks between Main and Washington streets, which cross Main street at grade. Five tracks, therefore, at present cross Main street at grade. The Lackawanna Railroad also maintains a freight house on the Buffalo river between Main street and Commercial slip, with tracks running thereto at grade through Prime street and across West Perry, Hanover, and Lloyd streets. All traffic, therefore, passes from the passenger station and the freight house across Main street at grade. In addition, a large coal trestle is maintained on Buffalo river, where large quantities of coal are handled each season and transported over the tracks aforesaid. For several years the railroad facilities and terminals have been inadequate to properly handle the passenger and freight business within the city of Buffalo, and the large number of grade tracks have been a great burden upon the streets in question. For several years efforts have been made to improve and enlarge the terminal facilities of the above-named railroads, and to remove as far as possible the grade tracks from the streets of the city, to the end that proper and adequate facilities might be had.

In 1910 the Lackawanna Railroad Company submitted to the Mayor of the city of Buffalo a proposed plan for the enlargement and betterment of their terminal, and proposed the removal of the grade tracks as far as possible. The state public service commission made an official investigation of the matter, and instituted a proceeding having as its primary object the removal of the dangers incident to the grade tracks at the foot of Main street. Public hearings were held, and the commission passed upon the plan submitted as aforesaid to the mayor, and on the 14th of December, 1910, all of the commissioners, in a memorandum, stated that no site was available for the new proposed Lackawanna railroad terminal, except near the foot of Main street, or on the outskirts of the city, and that if such a terminal was constructed it would be necessary to construct the same east of Main

street, and for that purpose the closing or alteration of certain streets would be necessary.

On July 28, 1911, the Terminal Station Act became a law (chapter 842, Laws of 1911). This act created the terminal station commission of the city of Buffalo, and authorized and directed the commissioners to adopt from time to time plans for the purpose of relieving the congested condition of the railroad situation and terminals in the city of Buffalo, and to make and require such changes in the location and use of tracks, switches, terminals, stations, or railroad facilities for the transportation of passengers and freight, and to secure to the public freedom from obstruction of the streets of the city by railroads. The commission was further authorized to alter, change, or discontinue such streets as might be necessary in carrying out the purpose of the act, and to exchange lands belonging to the city of Buffalo for lands belonging to the railroads. In case of such exchange of city lands, or the appropriation thereof for railroad purposes, the act further provided for the appraisal of such lands and for the payment of the appraised value thereof. All provisions of the city charter which might be inconsistent with the Terminal Act were therein declared to have no application to the matters placed in charge of the commission under said act, and after the passage of the act no other city body had any authority over the matters intrusted to the commission by the act. The powers, however, of the state public service commission were in no wise restricted by the act in question.

After the passage of the act, litigation followed, and the constitutionality thereof was established. People ex rel. Simon v. Bradley, 207 N. Y. 592, 101 N. E. 766. Thereafter, and on December 16, 1911, the terminal station commission gave notice that it proposed to adopt a plan relating to the Lackawanna station, and gave notice of a public hearing, as provided by section 3 of the act. The plan proposed was substantially the same as the former plan proposed by the railroads and approved by the public service commission. Upon the hearing certain proposals were made for changes and alterations of the proposed plans, and after the hearing and upon the date aforesaid the terminal commission adopted the plan substantially in its original form and entered into the contract which is herein sought to be annulled. The plan and contract so adopted and made unquestionably provide for adequate terminal facilities for the city of Buffalo in respect to the railroads involved, and abolish substantially all tracks at grade by carrying the same over the streets at a proper elevation. To accomplish the results sought, the contract provides for the closing of a strip of the present Ohio street westerly from its junction with Elk street to the easterly line of Main street along its southerly side, and, through acquisition of an adjacent strip on the north, to practically relocate said street and open a new street, to be known as Ohio street, situate somewhat northerly of its present location. Front street, so called, was also discontinued, and certain exchanges of lands were proposed which placed in control of the railroads the territory which the commission deemed necessary for

the construction and maintenance of the proposed station, freight houses, and tracks connecting therewith.

[1] It is contended that the plaintiff's only remedy was to review the action of the commission by writ of certiorari. Such a proceeding would undoubtedly have been proper. People ex rel. Myer v. Adam, 74 App. Div. 604, 77 N. Y. Supp. 754. The plaintiff, however, did not avail himself of the remedy thus afforded within the statutory time, but waited until after the execution of the contract in question, and after large sums of money had been expended, before bringing this action. While the court should not herein consider the wisdom of the plan adopted for the new terminals proposed, the plaintiff has a right, we think, to question in this action the legality and validity of the contract made with the railroads for carrying out the plan, and to question the powers vested in the terminal commission to execute the contract in question. The plaintiff, being a taxpayer, has the right to maintain an action to declare null and void official acts, if unlawful and unauthorized by law. Section 1925, Code of Civil Procedure; section 51, General Municipal Law; Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263; Kittinger v. Buf. Traction Co., 160 N. Y. 377, 54 N. E. 1081. Plaintiff in this action makes no claim of fraud, collusion, or bad faith on the part of the terminal commission or railroad defendants.

[2] The appellants first contend that after the public hearing the commission made certain modifications to the proposed plans, and that, because no further public notice was given, the adoption of the modified plans was illegal and contrary to the act. As the modifications in question were the result of the public hearing held, such claim has no foundation, and it is clear that no other notice was required by the act. It is, in fact, provided that the testimony taken at the public hearing shall be reduced to writing, and that the commission shall make a report in writing "wherein they shall state the plan adopted by them." This "report shall be filed in the office of the clerk of Erie county, together with the testimony taken before the commissioners, and such report shall thereupon become the plan for the part of the work provided for or referred to therein." The words of the statute in question clearly dispose of the above objection in favor of the respondents.

[3, 4] The plan adopted provides for the laying of an extra single track in Water street at grade for a distance of about 350 feet from the westerly side of the Commercial slip, and substitutes an overhead crossing in Main street. The single track in Water street, leading from the main track of the railroad, is for the purpose of relieving the heavy traffic heretofore passing over Main street to and from the warehouses extending from the westerly line of Main street to near the foot of Commercial street, and the evidence seems to clearly demonstrate the necessity for this track, and the terminal commission clearly had authority under the act to provide for the laying of such extra or new tracks as might be necessary to carry out the general purpose of the act; otherwise, the city might be deprived of many benefits which could be derived from the changing, alteration, and relocation of the railroad

tracks extending to and from the terminal. The same reasoning applies to the continuance of a single track across Main street at grade for the purpose of handling freight from the freighthouse of the company, which is situated westerly of the street. It appears that the continuation of this old track is made necessary to take care of congested freight traffic. The plan containing the provision for the track in question was, as before stated, submitted to and approved by the public service commission. While the elimination of all tracks at grade was of primary importance, that commission recognized the existing necessity for the one track at grade. The appellants' objection to the placing of a supporting pier in the center of Main street to carry the girders for the overhead tracks is clearly without merit, as the question involves simply the method for crossing Main street, and does not involve in any way the question of authority of the terminal commission under the act in question. As before stated, it is not for the court in this action to consider the wisdom of the terminal commission in its adoption of the plan.

[5] Similar questions are raised in respect to the new fireboat slip proposed to be constructed a short distance easterly from its present location, of larger size, with a concrete dock, and also in respect to the installation of new water mains and intakes to be used in connection with the fire tug. It is provided in the contract that the railroad shall pay a stated sum to the city as the estimated cost of installing these water mains and intakes, if the city desires to accept such sums and construct the mains and intakes, and, in case the city shall not so elect, that the railroad shall install the same without expense to the city. The land occupied by the old slip is to be exchanged for the lands embraced in the new, and said parcels are to be appraised under section 7 of the act. It is therefore apparent that the change of location of the slip will be without expense to the city, and that the city will thereby acquire a new, enlarged, and much improved fireboat slip in exchange for the old, together with new and adequate mains and intakes to be used in connection with the fire tug. A triangular-shaped parcel of land lying west of Main street and abutting Buffalo river is to be conveyed by the Lackawanna railroad to the city. Such conveyance is made necessary by reason of the fact that the city has heretofore maintained in Washington street, running to Buffalo river, a certain water main with connections for fire tugs. The spur end of Washington street extending to the river being closed by the plan adopted, it is necessary that a new water main be elsewhere constructed for the protection of the city. The new mains and intakes are proposed to be placed on this triangular parcel, which is adjacent to the river and so located that the fire tug can lie alongside and pump water into the main. The cost of the construction of the new main and intakes is to be borne entirely by the railroad company. It is apparent that the adoption of that portion of the plan objected to as aforesaid was necessary in order to carry out the general scheme, and that the city of Buffalo will ultimately be greatly benefited thereby. Both this triangular parcel of land and the spur end of Washington street have been appraised, and the commission, therefore, cannot be said to have exceeded its author-

ity by so including this triangular parcel in the plan, since its necessity is apparent.

Among the streets of the city to be closed, as provided in the plan adopted by the terminal commission, are portions of Prime street, Ohio street, Front street, and those portions of Washington, Indiana, Illinois, Mississippi, Liberty and Columbia streets which extend from Ohio and Elk streets to the Buffalo river or to Front street (so-called). The strip of land called Front street extends along the northerly margin of Buffalo river, the portion proposed to be discontinued lying between Main street on the west and extending easterly for some distance past the extension of Columbia street along Buffalo river. The contract with the railroads provides for the appraisal of all lands in which the city has the fee embraced within such streets in the manner provided by section 7 of the Terminal Act, and that the city shall be compensated therefor. In respect to the streets closed in which the city has no fee, no compensation whatever is to be paid to the city. The city has no fee in Front street, or to the stub ends of Indiana, Illinois, Mississippi, and Columbia streets. There is a question which cannot be here determined as to whether or not the city has the fee in Liberty street or in the stub end thereof extending to the river, there being a dispute as to whether or not the fee of a portion of this street is in the abutting owners or in the municipality. Whichever the case may be, the fee can be acquired by condemnation proceedings and as provided in the Terminal Act, and, if it is there determined that the city owns such fee, proper compensation must be provided.

[6] An appraisal has been had of the value of all lands situate in the closed streets in which the city has a fee. The appellants, however, claim that the public has an easement of value in the portions of the other streets to be closed in which the city has no fee, and that the terminal commission had no right or authority whatever to close these streets and to surrender such rights without compensation from the railroads; the act of the commission being alleged to be unlawful and in violation of the Constitution of the state, which provides that "no county, city, town or village shall hereafter give any money or property, * * * to or in aid of any individual, association, or corporation." Article 8, § 10. The city as such has no property interest in the streets in which it has no fee. Even if it owned the fee in such streets, such fee would not be such a property right as would be protected by the above clause of the Constitution. People v. Kerr, 27 N. Y. 188; Craig v. Rochester City & Brighton R. R. Co., 39 N. Y. 404; Peck v. Schenectady R. Co., 170 N. Y. 298, 63 N. E. 357; People v. Tax Commissioners, 174 N. Y. 443, 67 N. E. 69; City of New York v. Rice, 198 N. Y. 128, 91 N. E. 283, 28 L. R. A. (N. S.) 375.

[7] Where the fee of a street or highway is in a city, the city holds the street in trust for the people at large.

[8, 9] The Legislature has authorized the terminal commission to discontinue such streets as may be necessary to carry out the project in hand, and has provided the means of appraisal of the streets in which the city has the fee, and has stipulated that the moneys awarded thereon be paid to the city. In respect to the streets to be closed in

which the city has no fee, only the public at large is interested, and the Legislature has full power and authority to release the public right therein, and to provide for the closing of the same whenever public interest requires. The city of Buffalo never had any right to sell or dispose of any of these streets in question or to divert the same to private use, and simply held the same as agent and trustee for the public, there being no property right in the municipality which falls within the language of the clause of the Constitution above quoted. Nor does the terminal act itself provide or contemplate any compensation to the city of Buffalo for the right to close any of those streets in which city has no fee. Section 9 of the act provides:

"The commissioners are authorized and empowered to acquire any lands in the city of Buffalo, *to close* or alter any street, alley or public place, to change in or remove from any such street, alley or public place any gas or water pipes, sewers, conduits or other objects, or change the grade of any street which they shall decide shall be necessary for the purpose of carrying out the plans and contracts hereby authorized, and the proceedings provided for in section 7 * * * shall be applicable for the purpose of acquiring *title to any lands* necessary to be taken."

Pursuant to section 7, an appraisal commission is provided for to ascertain "the fair market value of any lands *owned* by the city of Buffalo, to be exchanged or sold by it." It is therefore very plain that compensation is not to be received, except in respect to lands owned by the city. The mere right of the public to travel over the portions of the streets to be closed does not fall within the language of the act; such belonging to the people of the state at large, and not being confined to the inhabitants of the city of Buffalo. The closing of these streets would simply relieve the land over which they run from the burden of a public easement. The defendant railroads have acquired or must acquire by condemnation or purchase all of the rights of abutting owners and the rights of the owners of the fee in the streets in question. The appellants' claim, therefore, that the city is entitled to compensation for the loss of such public easements, is neither founded upon reason, nor does it fall within the provisions of the state Constitution or the Terminal Act.

[10, 11] In addition to the objections above considered, the appellants claim that the terminal commission has exceeded its authority in closing Front street, and very seriously contend that the closing of this street is an abuse of discretion and a waste of public property, and that by reason thereof the city of Buffalo has unnecessarily lost public rights of great material value. The city of Buffalo does not own the fee in the strip of land known as Front street. The Lackawanna Railroad Company owns all of the abutting property as well as the fee of the street, if it may be so called, and the wharves and docks constructed over and beyond it to Buffalo river. The appellants urge, however, that as Buffalo river is a navigable stream, and as this strip of land furnishes a public way to the docks and wharves on the northerly shore, the closing of this so-called street deprives the public of access to the navigable waters of the river and to the docks and wharves in question.

For many years, questions as to the character of Front street have frequently arisen, and actions to determine the ownership thereof and of the wharves and docks have been twice before the Court of Appeals. Parallel with Front street, and a short distance to the north, is Ohio street and also Elk street; the latter being really an extension of Ohio street to the east. These streets furnish a thoroughfare easterly from Main street, and practically all easterly and westerly travel and traffic along this portion of the city passes over these two continuous streets. So that the strip known as Front street has been principally used for travel to and from the docks and wharves along the north shore of Buffalo river, and by those persons who have used the strip in passing between the stub ends of the intersecting streets. It is claimed that the terminal commission might have adopted a plan for the construction of the proposed station and tracks further to the north, with a view of relieving the river front from the burden of the proposed station and tracks leading thereto. Such a course would have compelled the removal of Ohio and Elk streets further to the north, and would have compelled the relocation of these streets upon lands now owned by private individuals or by the railroads or city. It would still have been necessary to maintain extensive approaches across the strip of land known as Front street to the docks and wharves along Buffalo river, which are owned by the Lackawanna Railroad Company, and have always been owned by private individuals and not by the city. Such a modification of the plan adopted could undoubtedly have been accomplished, but whether or not such a modification would have been for the benefit of the city is a serious question. The terminal commission, in the exercise of its discretion, and after great labor and consideration, saw fit to adopt a plan which provided for the closing of Front street, and in so doing cannot be said to have abused the discretion conferred upon it by the Legislature, nor to have unduly deprived the public of any rights along the river front which it formerly enjoyed.

As the terminal commission determined that the closing of Front street was necessary to the general plan, and as it apparently acted within its authority, it makes little difference whether the strip of land known as Front street was a public street or not at the time the terminal commission took action. It appears that prior to 1830 a strip of land along the north bank of the Buffalo river east of Main street was used to some extent for travel to and from the water front. In the early '30's numerous resolutions were passed by the village authorities, referring to this strip of land and to the docks adjacent thereto, and referred to the same as a "street." It does not appear, however, that there was ever any dedication of the strip to the municipality for street purposes, or that there was any acceptance thereof as a street. The municipal authorities endeavored by resolution to compel certain lot owners to improve the street, and also attempted to close, by resolution adopted in 1832, the so-called original street, and to open a new one two rods in width. It does not appear that any such street was ever laid out, and the resolutions are of very little importance, except in so far as they show that some use was made by the public of this strip of land at the time of their

154 N.Y.S.—46

722 NEW YORK SUPPLEMENT (Sup. Ct.

passage. Docks were early built across this strip, and the same appears to have been worked as a street by the municipality. The waters of the river gradually extended under these docks, and by reason of dredging and erosion great encroachment was made by the river in the strip known as Front street, and sheds and elevators were built adjacent to and over the same. The municipal authorities at one time placed upon one corner of the street a street sign, upon which appeared the words "Front Street." Unquestionably the public has for many years crossed and recrossed this strip of land going to and from the wharves and docks, and has to some extent in this manner used and traveled the entire length of the street. It is clear that, if the city had any rights in this strip of land as a street or for public travel, such right was acquired by prescription. Therefore the public can only claim such rights in this strip of land as it had acquired by actual user; the extent of the prescriptive easement being governed entirely by the extent of the user. 37 Cyc. 40.

The right of the owners of the fee in Front street has never been questioned, until raised in the case of City of Buffalo v. D., L. & W. R. R. Co., 190 N. Y. 84, 82 N. E. 513, 16 L. R. A. (N. S.) 506. In that case it was sought to establish certain rights in the city in Front street and in the wharves and docks built over the same and extending into the Buffalo river. Judge Vann, in commenting upon the findings of the trial court, said, at page 94 of 190 N. Y., at page 516 of 82 N. E. (16 L. R. A. [N. S.] 506):

"About 1826 a public highway existed on the river front between Washington and Main streets. It still existed in 1838, when a dock was built by the abutting owners over and upon the land owned by them constituting said highway, covering it for its entire width and length. From that time to this the abutting owners have used the dock for dock purposes, and the general public have used it for highway purposes, neither use excluding the other altogether, although doubtless interfering with it to some extent. Under these circumstances, what became of the street when the dock was built? Can abutting owners destroy a street in this way? Did the construction of the dock annihilate the highway? There is no statute which gives it that effect, and according to the common law the street leaped from the ground to the dock and stayed there. It is there now unless it has been abandoned by nonuser, as we read the authorities. * * * While the street followed the dock, and covered the whole of it, that did not authorize the city to collect the wharfage; and although the dock was private property the same as the land beneath it, that did not authorize the defendant to prevent the public from using it for the same purpose for which they had previously used the land. The easement for travel still existed, but it was over the dock, which took the place of the land constituting the street.

Owing to inconsistent findings of fact, the Court of Appeals reversed the judgment appealed from and ordered a new trial, which trial was never had. The inconsistent finding above referred to was that Front street had not been traveled or used as a public highway for more than 6 years, which was inconsistent with the finding of fact that the public used the dock continuously from the time it was built, both for foot and vehicle traffic, as a way of communication from Main street and points east of Washington street.

The terminal commission was apparently in doubt as to whether or not the strip of land known as Front street was in fact a street, and,

although the railroad owned the fee of all lands along the Buffalo river at this point, the commission, desiring to remove all question as to the existence of a public thoroughfare, provided in its plan foı the closing of this strip of land as a street. The working out of the plan adopted by the terminal commission in respect to Front street will clearly be for the benefit of the city at large. As the docks have always been and still are of a private nature, the city not being entitled to collect wharfage, the sole benefit to the city has been and will continue to be derived simply from the excellence of the docking facilities provided and the proximity to proper and adequate railroad terminals. The plans adopted by the terminal commission offer the greatest opportunity to enlarge and extend the docks along the northerly shore of Buffalo river, and provide for direct connections with the railroad terminals. From the viewpoint of the city of Buffalo, therefore, great benefit must necessarily be derived from the execution of the plan as adopted and the performance of the contract in respect to Front street, and it is difficult to appreciate how actual loss can be anticipated to the general public by reason of the execution of the proposed plan.

[12] The right of the terminal commissioners to provide in these plans for accommodating lake traffic is questioned by the appellants. We do not think that this question is properly in the case. The fact that lands already owned by the railroads adjacent to Buffalo river are to be utilized for the erection of the new terminal should not give rise to the suggestion that the commission is endeavoring to obtain properties for the railroads for the purpose of aiding them in their competitive lake traffic. The fact that the property is adjacent to Buffalo river and the lake, of course, makes the spot chosen better adapted for the purposes of a railroad terminal, and the commissioners not only had a right, but it was their duty, to consider the convenience of lake traffic and docking facilities in connection with the plan to be worked out to provide a proper and suitable railroad terminal. If the plan adopted has thus provided for proper concrete docks and wharves, the commission is not to be criticized for thus uniting the terminal proposition with the lake traffic of the railroads. The authorities of the city of Buffalo have for many years had supervision over both private and public docks and wharves which are of a quasi public character. It is apparent that the Legislature intended to empower the commission to adopt such plans as might be necessary in the premises, and certainly the plans would be inadequate if they did not provide for a proper union between the lake and land transportation facilities of the city. This is all that the commission apparently had in mind in adopting that portion of its plan which relates to Front street and the docks over and along the same. The Terminal Act specifically authorized the commission to adopt plans "for the purpose of relieving the congested condition of the railroad stations and terminals in the city of Buffalo, which plans shall require the railroads or *other transportation corporations* operating within the city of Buffalo to make such changes" as seem necessary to the commission. It therefore appears that the Legislature intended to authorize

the commission to adopt such plans as might be necessary in order to properly provide, not only for the railroad terminals themselves, but for proper connections with other transportation corporations.

[13] Pursuant to the provisions of the Terminal Act an appraisal commission was duly appointed by the Supreme Court, of which commission Hon. Albert Haight, a former judge of the Court of Appeals of this state, was the head. Hearings were had before the commission, and a report was rendered, which forms a part of the case on appeal. The value placed by the commission upon the parcels of land to be conveyed to the railroad exceeded the value placed upon the lands to be conveyed by the railroad to the city by about the sum of $98,000. Under the terms of the contract, such excess was to be considered the city's contribution toward the expense of elimination of grade crossings and relocation of streets provided by the contract. The evidence shows that the expense of the elimination of such grade crossings and the relocation of streets will be approximately the sum of $572,712.50. Upon the basis agreed upon, the city would bear 17 per cent. of the cost and the defendant railroads about 83 per cent. The appellants contend that the provision of the contract in respect to the above contribution on the part of the city is illegal, and renders the entire agreement void, on the ground that it violates the Terminal Commission Act and also subdivision 10 of article 8 of the state Constitution, which is above quoted. The contract provided that if, on the appraisal of the properties exchanged, a balance should be found in favor of the railroad, the railroad should release and discharge the city from any obligation to pay the same. It therefore appears that the contract is fair and reasonable from the point of view of the city of Buffalo. The sixth section of the Terminal Commission Act provides as follows:

"The commissioners may agree with any railroad or other transportation corporation interested, and any of them, what portion of the work necessary to be done shall be done by any such company interested, and what portion of the work shall be done by the city, and what portion *of the cost* of the proposed improvement shall be paid by each, the cost of any structure and the maintenance thereof built upon the lands to be used by any railroad company in the erection and maintenance of its railroad passenger or freight stations," line or bridge, "shall be at the sole expense of said railroad company interested."

In case the commission and the railroads should be unable to agree on the amount or proportion to be borne by each, a method is provided by section 8 of the act for determining and fixing the same. Under section 11 the commission is authorized to allow the railroad to do the entire work, and that the cost thereof shall be apportioned as provided in section 8. It is therefore apparent that the statute contemplates that a fair burden of the cost of the improvements in question relating to the elimination of grade crossings shall be borne by both the railroad and the city.

In considering the act in question, Judge Chase, in his opinion in People ex rel. Simon v. Bradley, 207 N. Y. 592, 101 N. E. 766, says:

"I am of the opinion that the act does not contemplate the use of city money, directly or indirectly, for private purposes. It is true that the expenditures for street purposes are in large part made necessary by the changes in

the terminal facilities of the railroads provided by plans adopted by the commissioners, but the changes in the streets are, nevertheless, city purposes and the expenditures therefor are proper public expenditures."

As the proportion to be paid by the city seems to be. entirely in its favor, the commissioners do not seem to have exceeded their authority in contracting to contribute the $98,000 excess toward the improvements in question. The fact that the money was not paid into the city treasury by the railroads and afterwards disbursed does not affect in the least the validity of the contract in question. The method proposed is much easier and simpler, and it is unjust to claim that any advantage of the city is taken by reason of the retention of the moneys by the railroad companies in the manner provided in the contract.

Upon the whole, the terminal commission seems to have expended a large amount of time and labor in its endeavor to formulate the plan adopted for the improvement of the terminals and railroad facilities in the city of Buffalo and freeing the streets from obstructions. The plan adopted and the contract thereafter executed will, if carried into effect, greatly benefit the city of Buffalo. In adopting such plan and executing such contract, the commissioners, in our opinion, have not exceeded the authority conferred upon them by the Terminal Act, nor is the contract illegal or void under any provision of the state or federal Constitutions or of the Terminal Act.

The judgment appealed from should therefore be affirmed, with costs to the terminal commission and to the railroad defendants. All concur.